Marian D. FLICKINGER, and Norfolk Federation of Teachers, affiliated with American Federation of Teachers, Local 4261, Plaintiffs,

v.

SCHOOL BOARD OF the CITY OF NORFOLK, VIRGINIA, and Gene R. Carter, Superintendent, Norfolk Public Schools, Defendants.

Civ. A. No. 91–507–N.

United States District Court, E.D. Virginia, Norfolk Division.

July 24, 1992.

Robert E. Paul, Zwerdling, Paul, Leibig, Kahn, Thompson & Driesen, P.C., Washington, D.C., for plaintiffs.

Harold P. Juren, Deputy City Atty., Office of City Atty., Norfolk, Va., for defendant School Bd. of City of Norfolk.

Conrad M. Shumadine, Willcox & Savage, P.C., Norfolk, Va., for defendant Gene R. Carter, Superintendent, Norfolk Public Schools.

## OPINION

REBECCA BEACH SMITH, District Judge.

This case came before the court on a trial by jury. At the close of all the evidence, the court dismissed Defendant Gene R. Carter from the suit and, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, granted judgment as a matter of law to the remaining Defendant, the School Board of the City of Norfolk. The reasons for this decision as stated from the bench are now set forth in this Opinion.

## I. FACTS

The undisputed facts of this case were as follows. Plaintiffs were the Norfolk Federation of Teachers (hereinafter "NFT"), a teachers' union affiliated with the American Federation of Teachers, and Marian D. Flickinger, President of the NFT. Ms. Flickinger has been President of the NFT since 1981. Defendants were the School Board of the City of Norfolk (hereinafter "School Board" or "Board") and Dr. Gene R. Carter, Superintendent of the Norfolk Public Schools (hereinafter "NPS"). Dr. Carter was sued only in his official capacity as Superintendent of the NPS. The School Board was sued as a corporate entity; its members were not sued individually.

Pursuant to a process called "meet-and-confer," [1] whereby the NPS and teachers' organizations, such as the NFT, attempt to come to a non-binding agreement with respect to policy matters affecting school system employees,[2] the NFT and the NPS reached an agreement memorialized in a Memorandum of Understanding (hereinafter "Memorandum") for the two-year period beginning July 1, 1990, and ending June 30, 1992. Section 5.6 of the Memorandum provides for a year-long leave of absence for teachers who are elected presidents of their teacher organizations. The school administration has full discretion to grant or to refuse to grant such leave.[3]

---

**1.** "Meet-and-confer" was also referred to at trial as "meet-and-discuss." The two terms will be used interchangeably in this opinion.

**2.** In the state of Virginia, public employees are prohibited from engaging in collective bargaining. *Commonwealth of Va. v. County Bd. of Arlington County*, 217 Va. 558, 581, 232 S.E.2d 30, 44–45 (1977).

**3.** Section 5.6, "Leave of Absence for Certain Teachers," provides in full:

The right of teachers to organize into groups and associations to advance their professional interests is recognized. Should a teacher who is elected president of a group or association wish to obtain an approved leave of absence for an entire year or a release time schedule for one-half of the duty day for a period of one (1) year, the administration will consider such request. The request must be filed in writing on or before June 1st. No application for leave of absence will be considered after such date. The application for leave of absence or adjusted daily schedule must be accompanied by a commitment from the group or association to pay the salary and cost of all

In March, 1991, Ms. Flickinger applied for a leave of absence for the 1991–92 school year. For each of the seven previous years, Ms. Flickinger, as President of the NFT, had requested and received such a leave. During each of those seven years of leave, the union paid her salary and provided her benefits, pursuant to the requirements of § 5.6, *supra* note 3. However, Ms. Flickinger continued to accrue seniority, step increases in salary, and retirement benefits, just as if she were a classroom teacher. By letter dated May 13, 1991, Dr. Carter informed Ms. Flickinger that her leave request for the 1991–92 school year was denied.

The denial of Ms. Flickinger's leave was fully supported by the School Board. Before making a decision about Ms. Flickinger's leave request, Dr. Carter informed Board member Jean Bruce that he was inclined to deny Ms. Flickinger an eighth year of leave, but that he would not do so without the unanimous approval of the Board.[4] Ms. Bruce contacted the chairperson of the Board, Dr. Lucy Wilson, who conducted a phone poll of the School Board members, all of whom cast their vote in favor of denial of leave.

The president of a rival teacher's association, the Education Association of Norfolk (hereinafter "EAN"), was granted a second year of leave for the 1991–92 school year. No teacher in the history of the NPS, with the exception of Ms. Flickinger, has ever been granted a leave of absence for more than two years.

During her tenure, Ms. Flickinger has been a zealous advocate for her membership and, on occasion, a vociferous opponent of the School Board and the NPS. Her criticisms of the Board and the NPS have appeared frequently in the press[5] and have been voiced in Board meetings.[6] After both Ms. Flickinger and the executive board of the NFT, on separate occasions, met with Dr. Carter to discuss the denial of leave,[7] Ms. Flickinger and the union became convinced that Ms. Flickinger's leave was denied in retaliation for her statements and activities on behalf of the NFT.

Plaintiffs filed suit in this court against Dr. Carter and the School Board on August 14, 1991, claiming that the denial of leave violated their First Amendment rights of free speech and association and violated their right of equal protection of the laws under the Fourteenth Amendment.

## II. VIRGINIA STATUTES AND SCHOOL BOARD BYLAWS AND POLICIES [8]

A number of Virginia state statutes are relevant to the disposition of this case. These statutes vest supervision of the schools in the School Board, a corporate body pursuant to Virginia law, and define the parameters of the School Board's powers and duties. These powers include the power to appoint the school superintendent.

---

economic fringe benefits for the period of leave or adjusted work schedule.

The school administration reserves the right to refuse any request for adjusted work schedule.

Even though the Memorandum in question applied only to the 1990–92 school years, the same or similar policy was in effect for a number of years preceding the 1990–92 school years.

4. Some members of the School Board, including Ms. Bruce and Dr. Lucy Wilson, had previously voiced their concern to Dr. Carter about Ms. Flickinger's continuing leave of absence. They testified that they felt such long-term leave was educationally, pedagogically, and administratively unsound.

5. Plaintiffs moved into evidence a large number of such critical newspaper articles.

6. Plaintiffs focused much of their attention at trial on one particular Board meeting, a public budget hearing held March 25, 1991. An unusually large number of teachers, along with other interested members of the public, apparently attended this meeting. An audio tape of this meeting was played at trial. It is clear from the tape that the audience members were quite vocal in their support of or opposition to the positions taken by various speakers. The cheering, booing and applause of audience members often interrupted the speakers and disrupted the proceedings. Ms. Flickinger both attended and spoke at this hearing.

7. Ms. Flickinger met with Dr. Carter on May 21, 1991. The executive board of the NFT met with Dr. Carter in July, 1991.

8. The court took judicial notice of the applicable School Board policies.

The statutes also define the parameters of the superintendent's powers and duties, which are prescribed by state law, by the School Board, and by the State Board of Education. *See* Va.Code Ann. §§ 22.1–28, 22.1–60, 22.1–70, 22.1–71, 22.1–78, 22.1–79 (Michie 1985 & Supp.1991).

Relevant School Board bylaws require a majority vote of the Board. *See* Norfolk School Board, *Bylaws*, §§ 2–21, 2–22 & 2–30 (adopted July 1, 1974). Additionally, the School Board has established a policy by which school employees and the school administration meet and discuss "mutually satisfactory solutions to the problems of public education and employment." [9] *See* Norfolk School Board, *Policy Manual*, § 8–1 (adopted January 19, 1978). The superintendent is charged with implementing such a meet-and-discuss procedure and is required to "promulgate such rules and regulations as, in his judgment, are desirable to carry this policy into effect." *Id.*

### III. LEGAL STANDARDS

#### A. Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure provides for judgment as a matter of law in actions tried by a jury:

> If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under controlling law be maintained without a favorable finding on that issue.

Fed.R.Civ.P. 50(a).

#### B. Controlling Substantive Law

##### 1. *Municipal Liability*

 In order to decide the liability of Defendants in this action, the court looked to the law of municipal liability.[10] Local governing bodies, including school boards and municipal officials in their official ca-

pacities can be sued directly under 42 U.S.C. § 1983 for monetary, declaratory, or injunctive relief when alleged unconstitutional action executes governmental policy or custom. *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under § 1983, a municipality may be held liable only for acts "for which the municipality itself is actually responsible, 'that is, acts which the municipality has officially sanctioned or ordered.'" *St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986)). Furthermore, the only officials who, by their actions, may subject a municipality to § 1983 liability are those municipal officials with final policymaking authority. *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924. These officials must have taken the allegedly unconstitutional action "pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of city's business." *Id.* (emphasis added).

 The question of who has final policymaking authority is one of state law, *id.*; *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300, and is "a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (emphasis in original). A court must look to "the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law,'" in order to determine which officials possess final policymaking authority for the allegedly unconstitutional action in question. *Id.* (quoting *Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926).

It is possible that final policymaking authority rests with more than one party or entity. *Praprotnik*, 485 U.S. at 126, 108 S.Ct. at 925. Furthermore, it is also possible for a municipal policymaker to have delegated its authority to another. *Id.* In those situations, it may be difficult to de-

---

**9.** *See supra* note 1.

**10.** As stated earlier, Dr. Carter was sued only in his official capacity as Superintendent, and the

School Board was sued as a corporate entity. *See supra* at 1–2.

termine exactly who has the *final* policymaking authority. However, the Court in *Praprotnik* provides some useful guidance. In addition to looking to positive law and custom and usage in order to determine who is the final decisionmaker, the Court also instructs that

> [w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision was final.

485 U.S. at 127, 108 S.Ct. at 926.

### 2. Burden of Proof in Retaliatory Action Cases

 In a case in which an employee alleges that an employer unconstitutionally deprived her of a valuable benefit[11] because she exercised her First Amendment rights, that employee has the initial burden of showing that her conduct was constitutionally protected,[12] *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), and that her protected conduct was a "substantial factor" or a "motivating factor" in the employer's decision to deny the valuable benefit. *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. Once the employee has carried that initial burden, the burden shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision with respect to the employee's benefit " 'even in the absence of the protected conduct.' " *Givhan*, 439 U.S. at 416, 99 S.Ct. at 697 (quoting *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576).[13]

### 3. Equal Protection

The Fourteenth Amendment guarantees "that persons in the same circumstances

---

11. During the course of the trial, the court ruled that the leave of absence at issue in this case was a valuable benefit. *See Perry v. Sindermann*, 408 U.S. 593, 597–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972); *see also Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69–75, 110 S.Ct. 2729, 2734–37, 111 L.Ed.2d 52 (1990); *Huang v. Bd. of Governors of the University of N.C.*, 902 F.2d 1134, 1140 (4th Cir.1990).

12. *See infra* note 19.

13. *But see Huang v. Bd. of Governors of the University of N.C.*, 902 F.2d 1134, 1140 (4th Cir.1990). The court in *Huang* apparently misstates the burden of proof in retaliatory action cases. It assigns to plaintiff the burden of proving that "but for" the protected expression, the employer would not have retaliated against plaintiff. Citing, *inter alia, Givhan*, the court stated:

> [I]t is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that "but for" the protected expression the employer would not have taken the alleged retaliatory action.

*Huang*, 902 F.2d at 1140. However, where protected expression has been found to be a substantial or motivating factor in the retaliation,

the Supreme Court has clearly placed the burden squarely on the employer to prove, by a preponderance of the evidence, that it would have acted in the same way with respect to the employee, regardless of the protected expression:

> [O]nce the employee has shown that his constitutionally protected conduct played a "substantial" role in the employer's decision not to rehire him, the employer is entitled to show "by a preponderance of the evidence that it would have reached the same decision as to [the employee's] re-employment even in the absence of the protected conduct."

*Givhan*, 439 U.S. at 416, 99 S.Ct. at 697 (quoting *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576). The Court in *Mt. Healthy* held:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decisions as to respondent's reemployment even in the absence of the protected conduct.

429 U.S. at 287, 97 S.Ct. at 576.

will be treated similarly by the law, and a corollary follows that the Constitution does not require 'things which are different in fact or opinion to be treated in law as though they were the same.'" *O'Bar v. Pinion*, 953 F.2d 74, 81 (4th Cir.1991) (quoting *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)).

■ Normally, in the context of equal protection, "the state may apply the law differently based on distinctive factual circumstances if the distinction is rationally related to a legitimate governmental purpose." *O'Bar*, 953 F.2d at 81. However, where a suspect class or the denial of a fundamental right is involved, the court engages in strict scrutiny in order to determine the constitutionality of the action taken. *Id.* at 81–82. That is, the court "sharpens its focus to determine whether the classification is narrowly tailored to serve a compelling governmental interest." *Id.* at 82. The same analysis for "equal protection review of the individualized decision of ... state official[s] made within [their] lawful authority" applies as for the equal protection review of a legislative decision. *Id.* at 81.

## IV. ANALYSIS

### A. Final Policymaking Authority

■ As was stated, *supra* at 590, *Jett* mandates that the court determine, *as a matter of state law before sending the case to the jury*, who has final policymaking authority. 491 U.S. at 737, 109 S.Ct. at 2723. Accordingly, pursuant to state statutes, custom and practice, and School Board policy, this court found as a matter of law in this case that such authority is vested in the School Board.

The state statutes enumerated, *supra* at 589, make it clear that the local school boards in Virginia are charged with being the local governing bodies of the school divisions. The school boards not only appoint and oversee school division superin-

tendents, but also administer and regulate the entire school system. Moreover, the facts of this case comported with this interpretation of state law. It is an undisputed fact that Dr. Carter required the unanimous consent of the School Board before he would deny Ms. Flickinger's eighth consecutive leave of absence, and that the Board, upon being polled, unanimously agreed to the denial. Thus, the School Board and Dr. Carter understood that the Board had the authority to make the final decision to deny Ms. Flickinger's leave, and they acted in accordance with that authority.

That the School Board is the final decisionmaker also comports with custom and practice. Not only did the School Board actually make the decision in this case, but the testimony of witnesses, and most particularly that of School Board member Anita Poston, established that all administrative decisions, even the most routine and mundane of personnel matters, are either made or reviewed by the School Board, and all decisions not made by the School Board are appealable to the Board. In fact, Ms. Poston testified that she had inquired as to the possibility of delegating some of the School Board's more routine decisions to other parties and was told that such action would be impossible.

Finally, Plaintiffs contended that School Board policy § 8–1, which established the Board's policy with respect to the meet-and-discuss process, supported a finding that Dr. Carter was a final policymaking authority regarding the leave policy. On the contrary, the court found that this policy supports the Norfolk School Board as the final decisionmaker. In § 8–1, the School Board recognizes the importance of maintaining communications with employees. This provision only charges the superintendent with promulgating rules and regulations in order to carry the *School Board's* policy into effect.[14] Thus, the superintendent establishes the *mechanism* by which meet-and-confer takes place, but

---

**14.** "In order to implement this *policy of employee involvement*.... [t]he superintendent shall promulgate such rules and regulations as, in his judgment, are desirable to carry *this policy* into effect." Norfolk School Board, *Policy Manual*, § 8–1 (adopted January 19, 1978) (emphasis added).

is not responsible for making policy. Nothing in § 8–1 binds the School Board to the results of any meet-and-confer sessions implemented by the superintendent. Testimony at trial established that the School Board retains its power to approve or disapprove any policies resulting from the meet-and-discuss process or the resulting memoranda of understanding. Accordingly, based on Virginia law and on the evidence in this case, the court found that the Norfolk School Board retains sole final decisionmaking authority in this matter.

### B. Dr. Carter's Liability

■ Although Dr. Carter could have been sued in his individual capacity, he was sued in this case only in his official capacity. The suit against him, therefore, was a suit against the municipality. Consequently, the only way Dr. Carter could have been held liable is if he had final policymaking authority or if he maintained joint or concurrent decisionmaking authority with the School Board. See Praprotnik, 485 U.S. at 123, 126, 108 S.Ct. at 924, 925. However, since the court determined that final decisionmaking authority rests solely with the School Board, Dr. Carter could not have been held liable in his official capacity. Therefore, as a matter of law, Dr. Carter was DISMISSED as a Defendant in this suit.

### C. The School Board's Liability

The remaining Defendant in this case was the Norfolk School Board. In order for the School Board to have been liable, either the Board itself must have made the decision, for unconstitutional reasons, to deny Ms. Flickinger her leave of absence, or the Board must have knowingly ratified both Dr. Carter's decision and his basis for that decision, assuming that the basis for Dr. Carter's decision was unconstitutional. See Praprotnik, 485 U.S. at 123, 126, 108 S.Ct. at 924, 925. The court will begin its discussion with the latter of the two alternatives.

### 1. The School Board's Ratification of Dr. Carter's Decision

■ The court may not presume knowledge on the part of the School Board of an unconstitutional basis for Dr. Carter's decision. Such automatic imputation of Dr. Carter's motives to the School Board would create a situation of respondeat superior, a doctrine that the Supreme Court has held inapplicable to § 1983 suits. Monell, 436 U.S. at 694, 98 S.Ct. at 2037; cf. Praprotnik, 485 U.S. at 126, 108 S.Ct. at 925 ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability"). Accordingly, Plaintiffs had to present evidence that the School Board members knew of the basis of Dr. Carter's decision to deny Ms. Flickinger the leave of absence.[15]

In this case, although it was undisputed that the School Board ratified Dr. Carter's decision, there was not a scintilla of evidence that the School Board members knew of any basis, constitutional or unconstitutional, for Dr. Carter's decision. Plaintiffs presented no evidence that Dr. Carter's basis was communicated to the School Board in any way.[16] In fact, Dr. Carter's only contact with the School Board regarding this decision was an informal discussion with Jean Bruce.[17] At that meeting, Dr. Carter told Ms. Bruce that the annual leave was never intended to be a permanent arrangement. There was no evidence that

15. Plaintiffs would normally also have had to present evidence that the basis for Dr. Carter's decision was unconstitutional. However, the propriety of the basis for Dr. Carter's decision became irrelevant to the disposition of this case, since the court found that the School Board never knew Dr. Carter's basis.

16. In point of fact, according to Ms. Flickinger, no basis for Dr. Carter's decision was ever even communicated to her, either in Dr. Carter's May 13, 1991, letter to her, which was written after the phone poll of the School Board members, in her May 21, 1991, meeting with Dr. Carter, or in the Executive Board's July, 1991, meeting with Dr. Carter. Dr. Carter's failure to state a reason for the denial of leave was one of Ms. Flickinger's complaints in this action.

17. The undisputed testimony showed that the discussion of the leave policy between Dr. Carter and Ms. Bruce took place during a meeting that was scheduled in order to discuss School Board matters unrelated to the leave of absence.

any other Board member ever communicated with Dr. Carter regarding his decision. Furthermore, the "voting" procedure of the Board never involved Dr. Carter. After receiving a phone call from Ms. Bruce explaining Dr. Carter's requirement of unanimous Board assent in his denial of Ms. Flickinger's leave, Dr. Lucy Wilson, as Chairperson of the School Board, conducted a telephone poll of the individual Board members.[18] The School Board members never even met to discuss the issue. Thus, the court could find no evidence that the School Board ratified the basis for Dr. Carter's decision, whatever that basis may have been. Therefore, the court could not hold the School Board liable for its ratification of Dr. Carter's decision.

### 2. The School Board's Decision

■ If the denial of leave is viewed as the decision of the School Board, Plaintiffs then had the burden of showing that their constitutionally protected conduct[19] played a substantial role or was a motivating factor in the School Board's decision not to renew Ms. Flickinger's leave of absence. *Givhan,* 439 U.S. at 416, 99 S.Ct. at 697; *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.[20] Plaintiffs, therefore, had to produce evidence of this substantial or motivating

factor. Plaintiffs failed to do so in this case.

Viewing the evidence in the light most favorable to Plaintiffs,[21] the court found only one piece of evidence *directly* indicating that anything about Ms. Flickinger's speech had anything to do with the decision to deny Ms. Flickinger her eighth year of leave: Ms. Flickinger testified that School Board member Betty Parkman told her in a phone conversation that Ms. Flickinger's proposal that administrators return to the classroom in order to help cut spending in a lean budget year was *a cause* of the leave denial.[22] The only other evidence remotely demonstrating that School Board members *might* have had an improper motive for denying Ms. Flickinger leave were statements made by two members of the Board, Anita Poston and Jean Bruce. Their comments gave some indication that they blamed Ms. Flickinger for the unruliness of the March 25, 1991, budget hearing.

However, even assuming that these three members of the Board had an improper motive in voting to deny Ms. Flickinger leave, which assumption was far from clear from the evidence presented, Plaintiffs still did not meet their burden of proof. Since a binding action of the Norfolk School Board requires a majority vote,[23] an improper motive cannot be imput-

---

**18.** There is also no evidence that Ms. Bruce ever talked to any other Board member, with the exception of Dr. Wilson, about her discussion with Dr. Carter. In her discussion with Dr. Wilson about the leave, Ms. Bruce simply relayed Dr. Carter's wishes regarding unanimous Board support of the denial of leave.

**19.** It is undisputed and without question in this case that Plaintiffs' conduct was constitutionally protected under the First Amendment.

**20.** Because the court found that Plaintiffs failed to show in any way that their constitutionally protected conduct was a substantial or motivating factor in the Board's decision to deny Ms. Flickinger another year of leave, the burden never shifted to Defendant to show by a preponderance of the evidence that the Board would have reached the same decision even in the absence of the protected conduct. *See supra* at 591 and note 13. Accordingly, the court did not address that issue.

**21.** The court did not dismiss this suit at the close of Plaintiffs' case, even though the Federal

Rules permit such a dismissal as a matter of law at that juncture. Fed.R.Civ.P. 50(a) ("If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue"). The court, however, allowed the case to continue in order that Plaintiffs might bring out on cross-examination of defense witnesses any further evidence relevant to proving their case. Thus, Plaintiffs were given every possible opportunity to present evidence sufficient to support their claim, which they failed to do.

**22.** The court accepted Ms. Flickinger's version of events as true for the purposes of this decision. However, Ms. Parkman's testimony differed from Ms. Flickinger's on this point.

**23.** *See supra* at 5.

ed to the entire School Board, which consists of seven members, on the basis of the motives of only three of its members. *Cf. Arroyo Vista Partners v. County of Santa Barbara*, 732 F.Supp. 1046, 1055 (C.D.Cal.1990) ("There is simply no allegation in the complaint that the [county] Board [of Supervisors], or at least a majority of the Board intentionally retaliated or discriminated against plaintiff for constitutionally suspect motives. To prevail, plaintiff is required to plead and prove that a majority of the Board so acted.") A majority of the School Board consists of four or more persons.

Plaintiffs presented no evidence of the improper or constitutionally suspect motives of any of the four remaining Board members. They presented no letters, no documentation, no statements, no actions, no meetings, no minutes, nor any other evidence of improper motive. The Board members never met or discussed with each other the issue of Ms. Flickinger's leave, nor did the members discuss their reasons with the Chairperson of the Board when she conducted the telephone poll. Furthermore, each and every member of the School Board, including Ms. Parkman, Ms. Bruce, and Ms. Poston, testified that Ms. Flickinger's speech and actions had nothing to do with his or her decision, and every member of the Board gave other substantial reasons for approving the denial of leave. Plaintiffs offered no evidence to refute this testimony, other than Ms. Flickinger's "belief" to the contrary, her one conversation with Ms. Parkman, and the general comments of Ms. Bruce and Ms. Poston.

Without other evidence to show improper motives on behalf of at least one additional Board member, that is, without a showing that a majority of the Board members arguably had an improper motive, the court could not have found that the School Board as a whole had an unconstitutional reason in denying Ms. Flickinger's leave, nor that such reason was a substantial or motivating factor in the decision.

In contrasting this case to the Supreme Court cases, *Givhan* and *Mt. Healthy*, evidence of improper motive was practically nonexistent here. In *Givhan* and *Mt. Healthy*, both retaliatory action cases in which teachers were not rehired by their school districts, there were letters or written statements to the complainants, which detailed reasons for the actions taken against them and the specific speech or incidents involved. In this case, Plaintiffs did not even identify any *particular* speech or conduct resulting in the denial of Ms. Flickinger's leave,[24] or any reasons for the denial, other than the disputed conversation with Ms. Parkman and the nebulous comments of Ms. Poston and Ms. Bruce about the budget hearing. To have allowed this case to go to a jury would only have served to establish an absurd precedent in which the speech of a public employee who publicly criticizes a government body will automatically be established as a substantial or motivating factor in any adverse decision taken by the government body regarding that employee.

Thus, this court, viewing the evidence in the light most favorable to Plaintiffs, could find "no legally sufficient evidentiary basis for a reasonable jury" to have found that Ms. Flickinger's protected speech or conduct was a substantial or motivating factor in the School Board's decision to deny Ms. Flickinger her eighth consecutive year of

24. Plaintiffs introduced into evidence a large number of newspaper articles, written over a number of years, in which Ms. Flickinger made arguably disparaging remarks about the School Board and/or the Norfolk Public School System. Plaintiffs seemed to be arguing that the negative comments in these articles, and the negative publicity generated by them, were a motivating factor in Dr. Carter's and the School Board's decision not to renew Ms. Flickinger's leave.

However, Plaintiffs failed to show any causal connection between these articles and Defen-

dants. Upon questioning, the School Board members could not even remember whether they had read the articles, much less remember Ms. Flickinger's comments contained therein. At most, some individual Board members remembered the issues involved and that articles were published about such issues. Without evidence of a connection between the reader and the article, the court would have been hard-pressed to find that these articles constituted a motivating factor in the School Board's (or Dr. Carter's) decision.

**596**

leave. Fed.R.Civ.P. 50(a). Consequently, the court GRANTED judgement as a matter of law to Defendant, the School Board of the City of Norfolk, on Plaintiffs' First Amendment claims.

### D. Equal Protection Claim

 Likewise, the court, pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, GRANTED judgment as a matter of law to Defendant, the School Board of the City of Norfolk, on Plaintiffs' equal protection claim.

The level of scrutiny to be applied in this case depended upon the disposition of Plaintiffs' First Amendment Claim. Since Plaintiffs were not members of a suspect class, strict scrutiny would have applied only if Plaintiffs had been denied their fundamental rights of free speech and free association. *See O'Bar*, 953 F.2d at 81–82. Since the court decided that Plaintiffs' First Amendment rights were not violated, the court applied the rational relation analysis.

In this case, it was manifest that the School Board's denial of Ms. Flickinger's leave of absence was rationally related to a legitimate governmental purpose. The School Board had a legitimate interest in seeing that teachers who remain on the school system's roster and accrue benefits, such as seniority, step increases in salary, and retirement benefits, actually teach; and it was rational for the Board to conclude that the skills of a teacher who has been out of the classroom for eight years have eroded. Thus, in this case, the School Board's interest in the welfare of the school children, in fairness to other teachers, and in the integrity of the school system was without a doubt rationally related to the action taken by the School Board in denying Ms. Flickinger an eighth consecutive year of leave of absence. Accordingly, Plaintiffs' Equal Protection claim failed as a matter of law.

### V. CONCLUSION

For the reasons set forth in this Opinion, Defendant Gene R. Carter was DISMISSED from this suit, and judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure was GRANTED to the remaining Defendant, the School Board of the City of Norfolk.

The Clerk is DIRECTED to send a copy of this Opinion to counsel for Plaintiffs and Defendants.