Paulette N. McWATERS, Plaintiff,

v.

John F. RICK, Stephen F. Owen, Roy J. Harrison, Robert R. Cosby, Edmund C. Burruss, Margaret H. Manning, and T.J. Bise, Defendants.

No. 3:01–CV726.

United States District Court,
E.D. Virginia,
Richmond Division.

April 4, 2002.

Betty S. Graumlich, Patrick M. Sweeney, Augustus S. Hydrick, Jr., McSweeney & Crump, Richmond, VA, for Plaintiff.

Jeff W. Rosen, Lisa Ehrich, Pender & Coward, Virginia Beach, VA, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

Pursuant to Fed.R.Civ.P. 12(b)(6), the defendants have filed a Motion to Dismiss the Complaint that initiated this action on the ground that it fails to state a claim upon which relief can be granted. The defendants also raise the affirmative defense of qualified immunity in their Motion to Dismiss. For the reasons set forth below, the Motion to Dismiss is denied.

## STATEMENT OF FACTS

The facts, as alleged in the Complaint, are set forth below. As required when considering motions pursuant to Rule 12(b)(6), the alleged facts are presumed to be true.

Paulette McWaters is a resident of Powhatan County, Virginia (the "County") and, from January 1995 until January 2000, she served as a member of its Board of Supervisors (the "Board"). Defendant, John F. Rick, is the County Attorney and has been so employed since 1997. Defendant, Stephen F. Owen, is the County Administrator and has been so employed since 1993. The other five defendants are members of the Board. Defendants, Roy J. Harrison,

Robert R. Cosby, Edmund C. Burruss, and Margaret H. Manning have been members of the Board since 1995; and defendant, T.J. Bise, has been a member of the Board since January 2000, after having defeated McWaters in a general election that was held in November 1999.

McWaters asserts two claims. Count I alleges a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. Count II alleges a violation of the First Amendment. Both counts are predicated on the same conduct, which is recited in detail below as it is alleged in the Complaint.

During McWaters' tenure as a member of the Board, its members were divided over issues respecting the financial management of the County's schools. McWaters avers that, throughout her term of service on the Board, she "was a consistent and outspoken critic of the School Board and the District Superintendent of Schools on that issue." During the final year of her term, McWaters cast the only vote against the County budget and levy, considering it to be fiscally irresponsible because of the level of spending that it allotted for public schools. McWaters also alleges that, on account of the same fiscal concerns, she was a vocal critic of other members of the Board and of Owen. (Complaint, ¶¶ 7, 41).

At a Board meeting in the fall of 1999, McWaters herself came under fire for fiscal imprudence when a citizen (who was an employee of the County's school district) complained about expenses that McWaters had incurred while attending conferences of the National Association of Counties ("NACO") and other organizations. In that regard, the Complaint explains that, in July 1998, McWaters and defendant, Manning, traveled to Portland, Oregon for a NACO conference related to their positions on the Board. McWaters and Man-

ning "jointly planned their Portland trip and agreed to share a rental car." The conference was to begin on July 19, 1998, however, McWaters was scheduled to attend a meeting of the Indoor Air Quality Advisory Committee of NACO on July 16. Therefore, she planned to arrive in Portland on July 15. As it turned out, that committee meeting was cancelled while McWaters was en route and she "was unaware of the cancellation until she arrived in Portland." (Complaint, ¶ 16). Although McWaters and Manning traveled to Portland on July 15, 1998, unlike McWaters, "Manning ... never had any scheduled official business in Portland until July 19 ... [and] had no apparent justification for arriving on July 15 ...." (Complaint, ¶ 17).

Shortly after McWaters returned from that trip, the Board "approved, and authorized payment of, [her] travel expenses related to the Portland, Oregon conference." Both Owen and Rick reviewed McWaters' expenses associated with the Portland conference "for appropriate form and for legality" before they were submitted to the Board for approval. (Complaint, ¶ 14).

Nothing further was heard about those expenses until the Board's meeting on October 11, 1999 (more than a year later) when, during the public comment period, a citizen named Denise Eyles addressed the Board and, as McWaters alleges, "rebuked [her] for spending County money on travel to conferences of [NACO] and other organizations." McWaters claims that Eyles "confined her criticism to [her], although each of the other four members had incurred expenses for attending such conferences[]" and that "Eyles said she focused on [McWaters] because her travel expenses in the aggregate were greater than the expenses of any other Board member and because [McWaters] had been a per-

sistent critic of the [County's] spending practices." Eyles' criticism was reported in a local weekly newspaper (on October 14) and in the *Richmond Times–Dispatch* (on October 25). (Complaint, ¶¶ 8, 9).

In response to this criticism, McWaters requested that Owen send a letter expressing his views as to the propriety of her travel expenditures. By letter dated October 25, 1999, Owen responded that he was "not aware of any improper reimbursements." He noted that each of the Board members "does things a little differently" and that, when needed, his staff requests appropriate documentation to reconcile travel expenses. Owen also indicated that McWaters properly had kept him advised of the conferences and seminars that she planned to attend and that the Board's meeting minutes reflected reports that she tendered about her attendance at such conferences and seminars. (Complaint, ¶ 10).

At some point in the days that followed, however, "Owen reported to his staff that he had developed doubts about whether [McWaters] had requested and received payment from the County for travel expenses associated with [the Portland conference] ... for one or more days before that conference officially opened. Without first contacting [McWaters] or consulting with the Board ... he asked Rick, as County Attorney, on October 28, 1999, to investigate the matter." McWaters claims that "Rick immediately initiated an investigation and notified the Chairman of the Board[,] ... [Cosby], of his investigation." (Complaint, ¶¶ 11, 12).

Thereafter, but still on October 28, Rick attempted to reach McWaters by telephone, but he was unable to do so. However, Rick was able to speak with McWaters' husband, who objected to the allegations of improper expenditures, as well as to the fact that an investigation had been commenced. McWaters' hus-

band also pointed out to Rick that other Board members had submitted, and had been reimbursed for, expenses similar to those that were at issue in the investigation of his wife. Rick advised that McWaters needed to contact him immediately on account of "the serious criminal and civil implications of her conduct." (Complaint, ¶¶ 18, 19).

McWaters spoke with Rick by telephone on the evening of October 28. Rick advised her that "Owen had remembered months after the Board ... had approved [McWaters' travel expenses from the Portland conference] that the 1998 Portland NACO conference began on July 19 and ended on July 21 but that [McWaters'] travel vouchers were for a period beginning July 15 and ending July 22." McWaters explained that, while she was en route to Portland, the Air Quality committee meeting had been cancelled. (Complaint, ¶ 20).

The fact that an investigation into McWaters' travel expenditures had been instituted was reported in the *Richmond Times–Dispatch* on October 31, 1999, two days before Election Day. In addition, McWaters alleges that, having been alerted to the investigation into McWaters' expenditures, "Bise, [McWaters'] opponent for election to the Board ... prepared and distributed a flyer attacking [her] for her travel expenses, particularly those associated with [the Portland conference]." (Complaint, ¶¶ 12, 13).

On November 22, 1999, and "without requesting or accepting input from [McWaters] or her attorney," Rick formally submitted a report of his investigation to the Board. McWaters requested an opportunity to respond to Rick's report, and Rick explained that she would be given such an opportunity at the Board's meeting on December 13, 1999. In reliance on Rick's representation, McWaters prepared a response for presentation both

orally and in writing. (Complaint, ¶¶ 22, 23).

However, "despite his personal request to address the Board and [McWaters'] request to the same effect, [McWaters'] counsel was not permitted to appear before the Board either in public session or in the Board's closed session on December 13, 1999, to respond to Rick's report . . . ." According to McWaters, Rick and Owen had "prearranged the manner in which Rick's report would be addressed by the Board." At the December 13 meeting, defendant Harrison made a motion "that the Board take no further action until the County Attorney forwards his findings to the Attorney General and State Auditor of Public Accounts and receives the results of their reviews pursuant to Section 15.2–1245 of the Virginia Code."[1] McWaters abstained from voting on this motion and the motion was approved by a vote of four to one.[2] (Complaint, ¶¶ 24, 25).

Rick forwarded his findings to the Attorney General's office, which responded on January 24, 2000 by referring Rick to the County's Commonwealth's Attorney "for his advice on the single issue of whether [McWaters] violated any law with respect to her request for, or receipt of, certain payments involving NACO meetings." Apparently, the County Commonwealth's Attorney recognized a potential conflict of interest and formally petitioned the Circuit Court to appoint a Substitute Commonwealth's Attorney to investigate this matter. By order dated February 4, 2000, the Circuit Court appointed Lee R. Harrison, the Commonwealth's Attorney for Amelia County, Virginia, as Substitute Commonwealth's Attorney for the County for the purpose of responding to the Board's request for an investigation into McWaters' expenditures. On April 27, 2000, Lee Harrison provided a written report on the McWaters investigation and, as McWaters alleges, "conclud[ed] that he could not find any criminal violation." (Complaint, ¶¶ 26, 27).

With that, the investigation was concluded. However, "[i]n defending herself during this investigation, [McWaters] incurred expenses of $21,153.94, which she formally requested the [Board] to reimburse." Notwithstanding that the Board "consistently and repeatedly [has] reimbursed its

---

**1.** Section 15.2–1245 of the Virginia Code, entitled "Procedures for allowance of claims," sets forth procedures for submitting accounts to governing bodies in the Commonwealth of Virginia and for investigating claims that might improperly be presented or verified. That statute, in relevant parts, states as follows:

A. No account shall be allowed by the governing body of the county unless made out in separate item with the nature of each item specifically stated . . . . The attorney for the Commonwealth, or the county attorney if there is one, shall represent the county before the board and advise the board of any claim which in his opinion is illegal or not before the board in proper form or upon proper proof, or which for any other reason ought not to be allowed.

B. If any claim has been allowed by the governing body against the county which in the opinion of such attorney is improper as to form or proof or illegal, the attorney shall seek the advice of the Attorney General as to legality or the State Auditor of Public Accounts as to matters of accounting. . . . If either the Attorney General or the State Auditor of Public Accounts is of the opinion the claim is illegal or in improper form, the attorney for the Commonwealth shall appeal from the decision of the governing body to the circuit court for the county. . . .

D. Nothing in this section shall prevent any county governing body from disallowing any account, in whole or in part, when rendered and verified consistent with [the provisions respecting submission and verification of such claims], or requiring any other evidence of the truth and propriety of any account as it thinks proper.

**2.** It is unclear which one of the Board members voted against the motion.

members" for legal expenses that they may have incurred in connection with their official duties, and despite the fact that the Board "has authorized payment of attorney's fees for Owen relating to legal advice about his own potential liability arising out of the handling of [McWaters'] travel expense investigation," the Board refused to reimburse McWaters. Indeed, according to the Complaint, on August 14, 2001, Owen informed McWaters that, on Rick's advice, the Board had determined that it "had no legal authority to reimburse her for such expenses." The Board reached this conclusion despite the fact that "Virginia law allow[s] a governing body to provide liability insurance covering legal expenses of its officers and employees *or to reimburse* a member of the governing body for his or her attorney's fees arising out of the discharge of official duties,"[3] a fact which the defendants allegedly knew or should have known. (Complaint, ¶¶ 29–32).

On October 26, 2001, McWaters filed this action seeking relief pursuant to 42 U.S.C. § 1983. The Complaint asserts two substantive grounds for relief.

In Count I, McWaters claims that "[e]ach of the defendants intentionally treated [her] differently from others similarly situated without any rational basis for the difference in treatment[ ]" in violation of the Equal Protection clause of the Fourteenth Amendment. The Equal Protection claim is based on both the institution of the investigation into McWaters' travel expen-

ditures and the Board's refusal to reimburse her for the legal fees that she incurred as a result of that investigation. (Complaint, ¶¶ 35–39).

In Count II, McWaters asserts that "[t]he investigation of [her] travel expenses ... and the denial of her request for County reimbursement of her legal expenses were motivated and activated by [her] outspoken criticism of other members of the Board ... as well as the management of [the County] ... and Owen himself." She claims that the investigation and denial of reimbursement were "intended to punish ... and to discourage her from publically expressing her views[ ]" and, as such, they "constitute retaliatory government action[ ]" in violation of the First Amendment. (Complaint, ¶¶ 40–45).

In each count, McWaters alleges that she "has suffered monetary and other injuries as a direct consequence of" the defendants' conduct. In addition, and also in each count, she seeks to hold the defendants liable in both their individual and official capacities.

Defendants filed the pending Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6), asserting that McWaters has failed properly to allege a cognizable claim either under the Fourteenth Amendment's guarantee of equal protection or under the First Amendment. In addition, they argue that the Court should dismiss McWaters' complaint because they are entitled to qualified immunity respecting the decisions and actions that she challenges.[4]

**3.** Va.Code § 15.2–1521, entitled, "Providing legal fees and expenses for officer or employee of county, city or town in certain proceedings", states as follows:
 If any officer or employee of any locality is investigated, arrested or indicted or otherwise prosecuted on any criminal charge arising out of any act committed in the discharge of his official duties, and no charges are brought, or the charge is subsequently dismissed, or upon trial he is found

not guilty, the governing body of the locality may reimburse the officer or employee for reasonable legal fees and expenses incurred by him in defense of the investigation or charge, the reimbursement to be paid from the treasury of the locality.

**4.** Defendants also premised their Motion to Dismiss on the ground that McWaters has failed to state a claim against the defendants in their official capacities. However, during

## DISCUSSION

### I. Standard Of Review Under Fed. R.Civ.P. 12(b)(6)

In considering a motion to dismiss a complaint for its "failure to state a claim upon which relief can be granted," a court must construe the complaint in the light most favorable to the plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. Fed.R.Civ.P. 12(b)(6); *see, e.g., In re MicroStrategy, Inc. Securities Litigation,* 115 F.Supp.2d 620, 627–28 (E.D.Va.2000); *Higgins v. Medical College,* 849 F.Supp. 1113, 1117 (E.D.Va.1994). All reasonable inferences must be made in favor of the nonmoving party, and "a count should be dismissed only where it appears beyond a reasonable doubt that recovery would be impossible under any set of facts which could be proven." *America Online, Inc. v. Great-Deals.Net,* 49 F.Supp.2d 851, 854 (E.D.Va. 1999) (*citing Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)); *see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957) (explaining that complaint should be construed liberally); *MicroStrategy,* 115 F.Supp.2d at 627–28. A motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Republican Party,* 980 F.2d at 952; *see also Edwards v. City of Goldsboro,* 178 F.3d 231, 243–44 (4th Cir.1999).

The defendants argue that, as a matter of law, "Count I fails because [McWaters'] allegations do not withstand Equal Protec-tion rational-basis scrutiny," and that, as a matter of law, Count II fails because [McWaters'] allegations of retaliation do not rise to the level accorded First Amendment protection.[5]

### II. The Affirmative Defense Of Qualified Immunity

The defendants have chosen to present their affirmative defense of qualified immunity in the form of a challenge to the legal sufficiency of the Complaint under Rule 12(b)(6). Before addressing the merits of the affirmative defense, it is necessary first to consider McWaters' argument that "generally, the affirmative defense of qualified immunity cannot be raised in a Rule 12(b)(6) motion."[6] In support of that contention, McWaters relies on decisions that either predate or fail properly to apply *Harlow v. Fitzgerald*[7] (and its bountiful progeny), which rather significantly altered the methodology by which courts must address the qualified immunity defense. Moreover, those decisions predate *Siegert v. Gilley,*[8] wherein the Supreme Court of the United States concluded that, to effectuate the purpose of the qualified immunity defense, it should be reviewed "critically at an early stage of the proceedings to determine the legal questions of whether the plaintiff has asserted a violation of a constitutional right and, if so, whether … [it] was clearly established at the time the defendant acted." *McVey v. Stacy,* 157 F.3d 271, 275 (4th Cir.1998) (citing *Siegert v. Gilley* (citation omitted)).

■ However, notwithstanding the importance of taking a "hard look" at the

oral argument they prudently abandoned this line of defense.

5. Memorandum Of Law In Support Of Defendants' Rule 12(b)(6) Motion To Dismiss, p. 3 (hereinafter "Defendants' Opening Br. at ____").

6. Plaintiff's Opposition To Motion To Dismiss, p. 21.

7. 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

8. 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

qualified immunity defense "at the dismissal stage," *id.,* it is important to remember the office of Rule 12(b)(6) and the scope of its inquiry, which is to test only the legal sufficiency of the Complaint. Where the qualified immunity defense is presented under Rule 12(b)(6), the motion to dismiss will be granted only if the basis for the grant of such immunity appears on the face of the complaint. *McVey v. Stacy,* 157 F.3d at 276 (whether the plaintiff has stated a clearly established constitutional claim "is answered with the facts of the complaint assumed to be true as a matter of law" because, "at the dismissal stage, 'it is the defendant's conduct *as alleged in the complaint* that is scrutinized ....'") (quoting *Behrens v. Pelletier,* 516 U.S. 299, 309, 116 S.Ct. 834, 840, 133 L.Ed.2d 773 (1996) (emphasis in original)); *Colman v. Vasquez,* 142 F.Supp.2d 226, 239 (D.Conn. 2001); 2 *Moore's Federal Practice,* § 12.34[4][6] (Matthew Bender 3d ed.). Therefore, it is appropriate to consider the qualified immunity defense at this stage of the proceedings—that is, under Rule 12(b)(6). To prevail at this stage, however, the defendants must identify how the defense is established by the allegations set forth in the Complaint.

The defense, as briefed, is ill-focused and hard to follow. Although the briefs reveal cognizance of the proper framework for asserting and reviewing the qualified immunity defense, they do not follow that framework in actually discussing it. Considering the briefs as a whole, however, it appears that defendants are asserting that McWaters has not alleged a constitutional right at all, rather than that the rights she asserts were not clearly established at the time of the challenged conduct.[9] The defendants do not contend that they did not

know, or reasonably should not have been expected to know, that their conduct violated the rights that McWaters asserts.

## A. The Law Of Qualified Immunity

■ Qualified immunity shields government officials from civil liability " 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *See e.g., Trulock v. Freeh,* 275 F.3d 391, 399 (4th Cir.2001) (*citing Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982)). The doctrine seeks to reconcile the competing interests of (1) deterring government officials from violating individuals' civil rights and (2) the need for such officials to act decisively and without undue fear of judicial second-guessing. *See e.g., McCrerey v. Allen,* 925 F.Supp. 1123, 1139–40 (E.D.Va.1996), *aff'd* 118 F.3d 242 (4th Cir.1997). Hence, qualified immunity insulates from civil liability and from the costs of litigation " 'all but the plainly incompetent or those who knowingly violate the law.' " *Trulock,* 275 F.3d at 399 (*citing Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

The determination whether a government official is entitled to qualified immunity proceeds in three distinct phases. "As an initial matter, courts must decide 'whether a constitutional right would have been violated on the facts alleged.' " *Brown v. Gilmore,* 278 F.3d 362, 367 (4th Cir.2002) (citations omitted).

If a violation of right would be established on the facts as alleged, the second step of the calculus requires the trial court "to assess whether the right at issue was clearly established at the time of the

9. For example, although the briefs talismanically recite the words "clearly established," they do not survey the state of the law in 1998 and 1999. Indeed, the qualified immunity

defense is presented largely by making reference to the same arguments that form the basis for the Rule 12(b)(6) attack on Counts I and II for legal insufficiency.

breach. The court should focus upon 'the right [not] at its most general or abstract level, but at the level of its application to the specific conduct being challenged.'" *Trulock*, 275 F.3d at 400 (*citing* Fourth Circuit cases and *Anderson v. Creighton*, 483 U.S. 635, 639–41, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (explaining that "the contours of the right must be sufficiently clear that a reasonable person in the official's position would have known that his actions violated that right.")). This does not mean that an official will be denied qualified immunity only where the very act in question previously has been held unlawful. Rather, "the unlawfulness must be apparent in light of pre-existing law." *Trulock*, 275 F.3d at 400 (*citing Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039 and *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992)).

Only where the plaintiff establishes a violation of a clearly established right "should the court next determine whether a reasonable person in the official's position would have known that his actions violated that right." *Trulock*, 275 F.3d at 400 (*citing DiMeglio v. Haines*, 45 F.3d 790, 794, n. 1 (4th Cir.1995)). When the inquiry reaches this final stage, "'the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.'" *Trulock*, 275 F.3d at 400 (*citing Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39).

**B. Whether McWaters Has Alleged Violations of Constitutional Rights**

**1. The Equal Protection Claim**

To begin, it is necessary to ascertain whether McWaters has alleged conduct which, if proved, would have violated her rights under the Equal Protection Clause of the Fourteenth Amendment. This assessment must be made by considering, as true, the allegations set forth in the Complaint.

**a. The Nature of the Claim**

In Count I, McWaters first alleges that the defendants acted arbitrarily, and in violation of her right to equal protection under the law, by instituting an investigation into only her travel expenditures when defendant Manning, a similarly situated Board member, had engaged in the very same conduct being investigated (and perhaps had acted in an even more questionable manner). McWaters also alleges in Count I an equal protection violation on account of the defendants' decision not to reimburse her for legal expenses that she incurred while defending herself during the aforementioned investigation when, in the past, the Board generally had approved such requests for reimbursement (including a request by Owen that arose out of his actions respecting the investigation of McWaters and in this very case).

**b. The Elements of an Equal Protection Claim**

■■■ To plead a cognizable claim that a law or policy was applied in violation of the Equal Protection Clause, a complaint must set forth facts alleging that: (1) a governmental agent or body intentionally accorded the plaintiff different treatment than it accorded other, similarly situated persons under the same law; (2) either the plaintiff is a member of suspect class or the government's treatment of the plaintiff was entirely arbitrary, irrational, intentional, and unrelated to any legitimate governmental interest; and (3) the plaintiff suffered an injury that was caused by the discriminatory treatment. *See generally, Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (noting that Equal Protection clause provides basis for objecting to the "intentionally discriminatory application of laws . . . ."); *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir.1995)

(explaining that selective enforcement claim is cognizable under Equal Protection clause where person was treated differently than others who were similarly situated and where difference in treatment was motivated by discriminatory, retaliatory, or malicious intent); *Woodley v. Department of Corrections,* 74 F.Supp.2d 623, 630 (E.D.Va.1999) (stating that "[t]o prove an equal protection violation, [a plaintiff] must prove similarly situated people have been treated differently by a governmental entity without adequate justification.") (*citing Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)); *Eisen v. Temple University,* 2002 WL 32706, at *1, n. 7 (E.D.Pa. Jan. 7, 2002) (unpublished). These elements must be alleged with sufficient specificity to avoid being conclusory, however, there is no heightened pleading requirement imposed on the plaintiff. *See, e.g., Crawford–El v. Britton,* 523 U.S. 574, 595, 118 S.Ct. 1584, 1595, 140 L.Ed.2d 759 (1998). The question, therefore, is whether McWaters' Complaint satisfies these requirements.

■ Here, the Complaint is not conclusory. To the contrary, it is specific and precise in setting forth the factual predicates underlying McWaters' legal theories. The defendants do not suggest otherwise.

### (1) Treatment Different from Similarly Situated Persons

As to the first element of the Equal Protection claim, McWaters alleges (1) that, in being investigated, she was treated differently than Manning, who was a similarly situated Board member; and (2) that, in being denied reimbursement of legal fees incurred in the investigation, she was treated differently than other similarly situated Board members and defendant Owen. (Complaint, ¶¶ 15–18, 29–32, 36). Thus, the first element of a legally suffi-

cient equal protection claim has been satisfied.

### (2) A Class of One Against Whom Defendants Intentionally Discriminated

McWaters does not allege that she is a member of a suspect class. Rather, she alleges that she is a "class of one" who was singled out and subjected to the irrational and arbitrary application of state law. Specifically, McWaters alleges that the defendants applied the powers of investigation and reimbursement, both of which are conferred upon the Board by statute, in a manner different than the way that it applied those powers to other similarly situated persons. Furthermore, McWaters alleges that the defendants acted intentionally in treating her differently. (Complaint, ¶¶ 34, 36, 41). The allegations of the Complaint, viewed in their totality, and, if proven, would establish that the defendants' decisions were arbitrary, unrelated to any legitimate governmental end, and intentionally discriminatory.

According to McWaters, her equal protection claim primarily is based upon the recent decision of the Supreme Court of the United States in *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). In that decision, the Court confirmed that its "cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564, 120 S.Ct. at 1074 (*citing Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923) and *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989)).[10] The Court emphasized that

10. *See also* 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Sub-*

"the purpose of the equal protection clause ... is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute *or by its improper execution through duly constituted agents.*" *Olech,* 528 U.S. at 564, 120 S.Ct. at 1074–75 (emphasis supplied). *See also Sylvia Development Corp. v. Calvert County,* 48 F.3d 810, 818–20 (4th Cir. 1995) (setting forth legal principles applicable to equal protection claims, stating that the constitution "requires that the states apply each law, within its scope, equally[,]" and explaining that the clause "limits *all* state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations.") (emphasis in original).

■ However, "[t]o prove that a statute has been administered or enforced [in a discriminatory manner], more must be shown than the fact that a benefit was denied to one person while conferred on another. A violation is established only if the plaintiff can prove that the state *intended* to discriminate." [11] *Id.* at 819 (emphasis in original) (noting factors that are probative in determining whether a decision-making body was motivated by a discriminatory intent).[12]

■ The defendants argue that McWaters has no viable equal protection claim respecting the initiation of the investigation because: (1) the decision to investigate McWaters was rationally related to a legitimate government interest—that is, "overseeing county expenditures";[13] and (2) McWaters and Manning were not similarly situated because no citizen had complained about Manning's travel expenses.

The defendants seem to have ignored that aspect of McWaters' equal protection claim in which she asserts intentional, arbitrary, and irrational disparate treatment in refusing to pay her legal expenses. Instead, for reasons neither expressed nor readily apparent, they have chosen to

---

*stance and Procedure,* § 14.7 (3d ed.1999) (discussing *Olech* and agreeing that "[t]here may be circumstances under which the separate treatment of a single person would violate equal protection even under the rationality test.").

11. The intent which must be alleged (and proved) is "more than intent as volition or intent as awareness. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group [or person]." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); *Sylvia Development Corp. v. Calvert County,* 48 F.3d at 819 n. 2.

12. In *Sylvia Development,* the Fourth Circuit also explained that "especially when [a] plaintiff is trying to uncover the motivation of a multi-member decisionmaking body, such as a zoning board[,] ... proof that racial discrimination was *a* motivating factor would not end the matter. Such proof merely shifts the burden to the decisionmaking body to demonstrate that 'the same decision would have resulted even had the impermissible purpose not been considered.' " 48 F.3d at 819, n. 2 (*citing Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)) (emphasis in original).

13. The defendants contend that, because the decisions that McWaters challenges do not implicate a suspect classification, the appropriate standard of review is rational basis scrutiny. They emphasize that such review is highly deferential and that, thereunder, courts are to presume the validity of a statute or decision and should uphold it so long as it is not patently illogical or illegitimate. *See e.g., FCC v. Beach Communications, Inc.,* 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989). The defendants are correct on this point, as a general rule of law. *See Tri–County Paving, Inc. v. Ashe County, et al.,* 281 F.3d 430, 438–39 (4th Cir.2002). *But see infra,* at 793, n. 14.

characterize that aspect of Count I as asserting a so-called "equal protection retaliation claim," which, of course, is not a cognizable equal protection claim. However, McWaters makes no such retaliation claim in Count I of the Complaint.

Without a doubt, the Board has an interest in overseeing county expenditures, however, that interest does not include the arbitrary and irrational use of a statutorily authorized investigative power as a vehicle for intentional discrimination. Moreover, no legitimate government interest justifies the exercise of a discretionary power to reimburse in a manner that is contrary to the plain language of the statute from which that power arises. As the Supreme Court has explained (in a different context), "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution[.]" *Evitts v. Lucey*, 469 U.S. 387, 401, 105 S.Ct. 830, 839, 83 L.Ed.2d 821 (1985); *see also Bradford v. School District No. 20, Charleston, S.C.*, 364 F.2d 185, 189 (4th Cir.1966) (explaining that school board could not exercise discretion in an arbitrary, capricious, or discriminatory manner). The unlawful use of a lawful power is not insulated from redress merely because, as the defendants contend, the power so used might lawfully have been used.[14] Such an argument cannot be squared with *Olech* or the decisions it cites.

To be sure, a public official enjoys no exemption from investigation with respect to his or her expenditure of public funds, which is a quintessential matter of public concern for members of governing bodies at all levels. Nor does McWaters claim any such exemption in Count I. She merely asserts that where, as here, her expenditures for the Portland conference previously were examined for legal sufficiency and propriety by Rick, Owen, and the Board member defendants,[15] where those expenses were determined to be sufficient in form and proper at law, and where another Board member (Manning) was almost identically situated respecting expenditures at the Portland conference, it was an arbitrary, irrational, and intentionally discriminatory act to investigate McWaters alone. The decision in *Olech* confirms that, as alleged, and limited in this manner, Count I presents a cognizable equal protection claim.

Defendants seek to avoid this consequence by arguing that McWaters' and Manning were not similarly situated because no citizen had complained about Manning's expenditures. McWaters' allegations, however, give rise to the inference that, in fact, the two were similarly situated. Again, in perspective of the facts that (1) Owen, Rick, and the Board already had reviewed and approved McWaters' expenses from the Portland conference by the time Ms. Eyles voiced her concern; and (2) Manning had traveled with McWaters to Portland several days before the conference was scheduled to begin without any official reason for doing so, it is appro-

---

**14.** The defendants cite *City of Dallas v. Stanglin*, 490 U.S. 19, 27, 109 S.Ct. 1591, 1596, 104 L.Ed.2d 18 (1989), for the proposition that "[i]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *Stanglin* involved an ordinance, which is a species of legislation, that limited the use of dance halls to persons between the ages of 14 and 18. *Stanglin* accurately reflects that, where sus-pect classifications and fundamental rights are not at issue, federal courts should review *legislation* in a deferential manner. Here, however, the court is not reviewing legislation but, rather, the *application* of legislation in the exercise of governmental powers.

**15.** Defendant Bise was not a Board member in October 1999 and, therefore, is not implicated in this aspect of Count I.

priate to view McWaters and Manning as similarly situated for present purposes. Both McWaters and Manning held elected positions on the Board of Supervisors. Both arrived in Portland two days before the conference was scheduled to begin and shared a rental car between them. Apparently, both had submitted, had obtained approval of, and had been reimbursed for, the expenses that they incurred during the Portland conference. Although Ms. Eyles may not have known these facts at the time that she publicly voiced her concerns about McWaters' spending, the defendants did. Thus, in perspective of the knowledge that the defendants possessed at the time, it is immaterial that the citizen mentioned only McWaters during the public meeting.

Moreover, and as explained above, the equal protection claim has another component—that is, the defendants' decision to deny McWaters' request for reimbursement of the legal fees that she incurred in connection with the investigation (after which she ultimately was exonerated of wrong-doing). Although she recognizes that Va.Code § 15.2–1521 vests in the Board discretion respecting whether to reimburse with public funds County officers or employees who have been investigated in connection with their official conduct or duties, McWaters again argues that such discretion may not, consistent with equal protection, be exercised in an arbitrary or irrational manner.

McWaters alleges that she was informed by Owen (on Rick's advice) that "the Board had no legal authority to reimburse her for [her legal expenses]." That statement, if proved to have been made, is plainly contradicted by Va.Code § 15.2–1521, which explains that, under these circumstances, the decision whether to reimburse an officer or employee of a locality is discretionary. In other words, the Board possessed the legal authority to reimburse

McWaters. The inferences that arise from this fact, viewed in light of McWaters' allegations that, ultimately, no criminal charges were brought against her, and that the Board (1) has granted such requests for reimbursement in the past and (2) granted Owen's request arising out of his actions in this very case, are adequate to sustain her equal protection claim at this stage. Perhaps that is why the defendants chose not to address this component of Count I.

### (3) Injury

As to the third element of an equal protection claim, McWaters' Complaint alleges monetary injury in the form of legal fees and costs, as well as other injuries which, other than the deprivation of constitutional right, are not specified.

Therefore, McWaters properly has alleged that her equal protection rights were violated.

### 2. The First Amendment Retaliation Claim

█ Next, it is necessary to assess whether, in Count II, McWaters has alleged a valid claim of retaliation against the exercise of her First Amendment rights which, like her equal protection claim, has two components.

### a. The Nature of the Claim and the Defendants' Position

Specifically, in Count II McWaters alleges that "[t]he investigation of [her] [travel] expenses ... and the denial of her request for County reimbursement of her legal fees were motivated ... by [her] outspoken criticism of other members of the Board, as well as the management of the Powhatan County School District and [defendant] Owen himself ... [and] was intended to punish her for her criticism and to discourage her from public[ly] expressing her views." She argues that this

conduct violated her "right to be free from ... retaliatory governmental action by reason of the Free Speech Clause of the First Amendment ...." (Complaint, ¶¶ 41–43).

The defendants, on the other hand, argue on two grounds that McWaters has not alleged a constitutional violation. First, they contend that "[a]n investigation against a publicly elected official is insufficient as a matter of law to constitute actionable retaliation." That is to say, the defendants argue that the injuries upon which McWaters bases her claims are *de minimis*. Second, they argue that McWaters "has failed to offer allegations sufficient to bolster a claim of improper motive or retaliation." Specifically, the defendants assert that their respective decisions to investigate and not to reimburse McWaters are "neither factually nor causally related to her opinions regarding the county schools."

### b. The Elements of a First Amendment Retaliation Claim

■ Retaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been appropriate. *See e.g., ACLU v. Wicomico Cty.,* 999 F.2d at 785 (*citing Mt. Healthy City School District Bd. Of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Bloch v. Ribar,* 156 F.3d 673, 681–82 (6th Cir. 1998) (*citing Matzker v. Herr,* 748 F.2d 1142, 1150 (7th Cir.1984) and *DeLoach v. Bevers,* 922 F.2d 618, 620 (10th Cir.1990)). The prohibition against retaliation for the exercise of a constitutional right is necessary to secure the full and meaningful exercise of the right itself.

■ The First Amendment guarantees the right to speak freely and to criticize public officials, *New York Times v. Sullivan,* 376 U.S. 254, 273, 84 S.Ct. 710, 722, 11 L.Ed.2d 686, (1964), and, "[t]o protect that right, public officials are prohibited from retaliating against individuals who criticize them.[16] Fear of retaliation may chill an individual's speech, and, therefore, permit the government 'to produce a result which [it] could not command directly.'" *Trulock v. Freeh,* 275 F.3d at 404.[17]

It cannot be gainsaid that:

The right to freedom of speech is the cornerstone of the American system of government. Our democracy requires full, open and robust debate without fear of punishment to survive and prosper. Only by the free exchange of information and ideas can Americans and their elected legislators hope to make reasoned, logical and wise decisions.

*Kucinich v. Forbes,* 432 F.Supp. 1101, 1110 (N.D.Ohio 1977). Therefore, "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond v. Floyd,* 385 U.S. 116, 135–36, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966). Indeed, "[l]egislators have an obligation to take positions on controversial political questions so that their constituents can be fully informed by them, and be better able to assess their qualifications for office; also so they can be represented in governmental debates by the person they have elected to represent them." *Id.* at 136–37, 87 S.Ct. at 349–50. It also should go without saying that "unconstitutional intrusion on the right to freedom of speech guaranteed by the First Amendment" ... "can no more be done by [the Board of

---

**16.** *See also Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir.2000).

**17.** Citing *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *ACLU v. Wicomico Co.,* 999 F.2d at 785.

Supervisors of Powhatan County] than it could by the Georgia House [of Representatives] in *Bond.*" *Kucinich,* 432 F.Supp. at 1113 (citations omitted); *see also O'Brien v. City of Greers Ferry,* 873 F.2d 1115, 1118 (8th Cir.1989) (stating that "[a] city council is not free to retaliate against a member of the council because of such member's exercise of first amendment rights.") (*citing Kucinich* ).

 Generally, a plaintiff asserting a claim of retaliation in violation of the First Amendment must prove: (1) that the speech was protected; (2) that the defendant's alleged retaliatory action adversely affected that constitutionally protected speech; and (3) that a causal relationship existed between the speech and the defendant's retaliatory action. *See, e.g., Trulock,* 275 F.3d at 404 (*citing Suarez Corp. Ind.,* 202 F.3d at 685–86). Where the plaintiff is a public employee, however, the requirements for stating a valid retaliation claim are somewhat different. A public employee must allege (and prove) that: (1) the employee spoke on a matter of public concern; (2) the employee's interest in speaking on the matter outweighs the government's interest in providing effective and efficient services to the public; (3) the retaliation was of the sort that would adversely affect the First Amendment right because it deprived the employee of a valuable government benefit or otherwise impacted him in a manner that, at the very least, would tend to chill his exercise of First Amendment rights; and (4) the speech was a "substantial factor in the decision to take the allegedly [adverse] retaliatory action." *See e.g., Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 351–52 (4th Cir.2000) (citing Fourth Circuit cases).

The public employee cases decided by the Fourth Circuit do not involve public employees who also are members of a governing body of a local government entity. Thus, before assessing whether McWaters has alleged the violation of a constitutional right in Count II of her Complaint, it is necessary to determine which, if either, of these two tests applies under the circumstances presented by McWaters' employment status.

### c. Which Test Applies

 McWaters is a public employee who, while the Board was in session (and otherwise), spoke out respecting the fiscal policies of the School Board and the governing body of which she was a member. Thus, her speech was critical of other elected officials. Of course, McWaters herself was an elected official who, in her capacity as such, would fully be expected to speak out on such matters. In this way, she is unlike the majority of public employees who allege retaliation and seek recovery under Section 1983. *See e.g., Scott v. Flowers,* 910 F.2d 201, 211–12 (5th Cir.1990). It is not entirely clear which retaliation test applies under these circumstances and, to complicate matters, courts have not been entirely consistent in their analytical approach. Thus, it is useful to consider other decisions involving analogous plaintiffs.

For example, in *Lewis v. Blackburn,* 734 F.2d 1000 (4th Cir.1984), reversed 759 F.2d 1171 (4th Cir.1985) (*en banc* ), the Fourth Circuit addressed a First Amendment retaliation claim brought by a former state magistrate judge against the clerk of the state superior court and a superior court judge. The plaintiff alleged that the defendants' respective decisions not to nominate and reappoint her to the position of magistrate judge were made in retaliation for her having publicly objected to performing nonjudicial administrative tasks and complaining about those tasks to certain elected officials. *Id.* at 1002–03. In assessing the viability of Lewis' claim, the Fourth Circuit's panel decision applied the principles of *Pickering v. Board of*

*Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *See Lewis v. Blackburn,* 734 F.2d at 1004–05. Sitting *en banc,* however, the Court of Appeals adopted, as its own, Judge Ervin's dissent from the majority of the panel. Judge Ervin also had used *Pickering* and *Connick* as the framework for decision. However, he had concluded that the plaintiff's speech was addressed to a private employment dispute, as opposed to a matter of public concern. In any event, the *Lewis* court applied the standard public employee formulation to resolve the retaliation claim of an appointed judicial officer.

In *Romero–Barcelo v. Hernandez–Agosto,* 75 F.3d 23, 26–28 (1st Cir.1996), the First Circuit considered a First Amendment retaliation claim brought by the former governor of Puerto Rico against high-ranking members of the Puerto Rico Senate. The plaintiff in that case alleged that, in retaliation for his political beliefs and associations, the defendants had engaged in a course of conduct intended to mislead the public into believing that he had been involved in the murder of two political activists. *Id.*

The First Circuit affirmed the district court's dismissal of this claim because it agreed that the First Amendment does not protect a politician whose rights to free speech and free association had been injured by other politicians seeking to undermine his credibility. *Id.* at 34. The court neither applied, nor even mentioned, the public employee or private citizen standards in affirming dismissal of the former governor's retaliation claim against sitting legislators. Rather, the *Romero–Barcelo* decision seems to have been premised, at least in part, on the fact that the plaintiff was a "policymaking" employee and, as such, was entitled to less protection in expressing his views under the First Amendment. *See e.g., Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).[18]

The Fifth Circuit has considered retaliation claims brought by elected officials and, in at least two of those cases, has applied the *Pickering* public employee standard. *See Colson v. Grohman,* 174 F.3d 498 (5th Cir.1999); *Scott v. Flowers,* 910 F.2d 201 (5th Cir.1990); *Smith v. Winter,* 782 F.2d 508 (5th Cir.1986). In *Smith,* the court reversed the district court's dismissal, under Rule 12(b)(6), of a retaliation claim brought by three elected officials of a county school board against the former governor of Mississippi and other high ranking county officials. 782 F.2d at 509–10. Although in *Smith,* the court did not set forth a specific legal standard to be applied to the claim, it held that the "complaint includes allegations that the local [officials] conspired through fraudulent means to misuse [state law] against [the plaintiffs] in retaliation for [their] exercise of their First Amendment rights. Such a complaint states a claim under [section] 1983." *Id.* at 512 (*citing* panel decision in *Lewis v. Blackburn* and *Bart v. Telford,* 677 F.2d 622 (7th Cir.1982)).

Later, in *Scott,* the Fifth Circuit considered "whether an elected judge may constitutionally be reprimanded for making truthful public statements critical of the administration of the county judicial sys-

---

**18.** The *Elrod/Branti* line of cases stands for the proposition that the government may base an adverse employment decision (including but not limited to dismissal, promotion, transfer, and post-layoff recall) on the political affiliation of its employee only where the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved. *See e.g., Rutan v. Republican Party,* 497 U.S. 62, 75, 110 S.Ct. 2729, 2737–38, 111 L.Ed.2d 52 (1990).

tem of which he is a part." 910 F.2d at 203. In reversing the district court's grant of summary judgment against the state judge, the Fifth Circuit employed the *Pickering* test to assess whether the judge's retaliation claim should have been dismissed, and it held that the Texas Commission on Judicial Conduct constitutionally could not reprimand the plaintiff for making public statements critical of the court system. *Id.* at 213.

Finally, in *Colson*, the Fifth Circuit considered a retaliation claim brought by a former city council member against a municipal police chief and other city officials. 174 F.3d at 499–506. The plaintiff in *Colson* alleged that city officials falsely accused her of criminal acts, instituted an investigation into her conduct, and instigated a recall election against her because they disagreed with her expressed political views. *Id.* The Court cited *Smith* and *Scott* in explaining that, even if it agreed with the *Romero–Barcelo* decision,[19] it was bound by circuit precedent; thus the court applied the . *Pickering* test to resolve the former council member's claim against appointed and elected city officials.

As discussed above, and as properly explicated by the Fifth Circuit in *Scott*, "public employees do not shed constitutional protections when they enter the work place[.]" Where the employee is an elected official, the *Pickering* balancing test recognizes the fact that the state interest in controlling criticisms "is much weaker then in the typical employee situation."

*Scott*, 910 F.2d at 211–12. However, the foregoing decisions indicate that the state may have some interest in regulating the speech of a public official.[20]

Furthermore, the decisions dealing with retaliation against public officials in elected or policymaking positions (or in positions that otherwise are analogous to McWaters' position) consider factors that, although not necessarily reflected in the generic test for retaliation, are represented (in their entirety) in the public employee retaliation test. Specifically, those cases consider whether the speech or conduct on account of which the plaintiff claims he was retaliated against is protected which, under *Pickering*, means whether it involved a matter of public concern. Those cases also consider the importance of the government's interest (or the lack thereof) in ensuring that the plaintiff's speech does not adversely impact the proper administration and effectuation of its functions. Finally, at least some of the cases consider the severity of the alleged retaliatory action and the issue of causation. These factors are all incorporated into the public employee retaliation test. For the foregoing reasons, and because the Fourth Circuit employed the *Pickering* formulation in deciding *Lewis v. Blackburn*, that approach will be followed here.[21]

### d. Application of the *Pickering* Test

#### (1) Protected Speech

The Fourth Circuit has explained that the answer to the inquiry whether an employee spoke on a matter of public con-

---

**19.** The court emphasized that the *Elrod/Branti* line of cases, upon which the *Romero–Barcelo* court had relied, permits the state to dismiss a public employee on the basis of his political beliefs only where (1) those beliefs would interfere with the discharge of his official duties and (2) the state can prove that dismissal is a narrowly tailored means of achieving a vital governmental interest. *Id.* at 508, 100 S.Ct. 1287. Ultimately, however, the *Colson* court held that it was unnecessary

to confront *Romero–Barcelo*, or to revisit *Smith* and *Scott*, because the plaintiff had not "suffered harms rising to the level of actionable retaliation." *Id.*

**20.** *But see infra,* at 799 n. 23.

**21.** *But see Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir.1999) (employing basic three-part test for retaliation where plaintiff was former elected city council member).

cern "rests on 'whether the public or the community is likely to be concerned with or interested in the particular expression, or whether it is more properly viewed as a private matter between employer and employee.'" *Edwards v. City of Goldsboro,* 178 F.3d 231, 247 (4th Cir.1999) (*citing Berger v. Battaglia,* 779 F.2d 992, 999 (4th Cir.1985)). Therefore, "whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Edwards,* 178 F.3d at 247. The defendants do not contend, nor would they succeed in arguing, that McWaters' speech was not a matter of public concern.

### (2) The Balance of the Interests

The next inquiry is whether McWaters' interest in speaking out on these matters outweighed the Board's interest in providing efficient and effective services to the public.[22] As the *Scott* court recognized, however, "the state's interest in suppressing [an elected official's] criticisms is much weaker than in the typical public employee situation, as [an elected official is] not, in the traditional sense of that term, a public *employee.*" 910 F.2d at 211–12. This is because, unlike ordinary public employees,

officials such as the justice of the peace in *Scott,* and McWaters in this case, are "not hired by a governmental employer [but instead are] elected official[s], chosen directly by the voters ... and, at least in ordinary circumstances, removable only by them." *Id.* at 212. Under these circumstances, "it was not unexpected that [the elected official] ... would be willing to speak out against what he perceived to be serious defects in the administration of justice in his county. Thus, the state cannot justify the reprimand ... as it could the discipline of an ordinary government employee, on the ground that it was necessary to preserve coworker harmony or office discipline." *Id.*

The same is even more true in this case, where the elected official-plaintiff is not a member of the judiciary but, rather, a member of the political, policy-making body of the County. Indeed, it persuasively could be argued that a governing body has no legitimate interest worthy of balancing against the substance of the speech of one of its elected members on matters of public concern (either where the governing body is formally in session or otherwise) other than assuring that such speech is in accord with law or with that body's own internal procedures.[23]

---

**22.** In *McVey,* the Fourth Circuit set forth the following non-exhaustive list of factors to be considered in balancing the employee's interest in speaking on matters of public concern against the government's interest in providing effective and efficient public services: whether the employee's speech (1) impairs discipline by superiors; (2) impairs harmony among co-workers; (3) has a detrimental impact on close working relationships; (4) impedes the performance of the public employee's duties; (5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the responsibilities of the employee within the agency; and (9) makes use of the authority and public accountability the employee's role entails. *See McVey,* 157 F.3d at 278 (*citing*

*Rankin v. McPherson,* 483 U.S. 378, 388–91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).

**23.** For example, and under certain circumstances, national security concerns, or laws permitting the non-disclosure of matters discussed by a governing body in a session that is lawfully closed to the public, arguably might afford grounds for such regulation of speech. *See generally, New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Snepp v. United States,* 444 U.S. 507, 520–26, 100 S.Ct. 763, 771–74, 62 L.Ed.2d 704 (1980) (Stevens, J., dissenting); *WJW–TV, Inc. v. City of Cleveland,* 686 F.Supp. 177 (N.D.Ohio 1988), *vacated, by* 878 F.2d 906 (6th Cir.1989); *Cole v. Colorado,* 673 P.2d 345 (Colo.1983) (*en banc*).

It is unnecessary to decide that question here because the County officials in this case have identified no interest in chilling the exercise of free speech rights by one of the County's elected officials, or in limiting the number of viewpoints to which the citizenry is exposed, with respect to issues of public educational and financial policies. In any event, even if the balancing test set forth in *McVey* were called into play, the balance strongly favors McWaters' interest in speaking out.

### (3) Is the Retaliation Such As Would Be Expected To Chill Exercise of the Right of Free Speech?

█ It is well-settled that not all adverse action constitutes unconstitutional retaliation. Rather, "where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim." *ACLU v. Wicomico Cty.*, 999 F.2d at 785 (holding that detention center's restrictions on ACLU paralegal's visitations did not constitute sufficient harm upon which to base retaliation claim). *See also Suarez Corp.*, 202 F.3d at 686 (noting that criticisms, false accusations, and verbal reprimands generally are not actionable); *Saleh v. Upadhyay*, 2001 WL 585085, 11 Fed.Appx. 241, 255–56 (4th Cir.2001) (explaining that the "dispositive inquiry is whether the adverse actions complained of, under the particular circumstances of the case, would deter the employee from again exercising his constitutional right to publically comment on matters of public concern.").

Whether retaliatory conduct has an adverse effect on the right of free speech is a is a "fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez Corp.*, 202 F.3d at 686 (quoting *Thaddeus–X v. Blat-*

*ter*, 175 F.3d 378, 398 (6th Cir.1999)) (explaining that "the definition of adverse action is not static across contexts."). The component that is of central importance in this case is the nature of the retaliatory acts.

The first alleged retaliatory act is the initiation of an investigation into travel expenditures that had been reviewed and approved by the defendants approximately one year before the investigation began, and the propriety of which had been confirmed by Owen, the County Administrator, after they were called into question during a public meeting. The investigation was directed against a person who had been openly critical of the alleged retaliators' fiscal decisions, and it targeted only one of two people who had engaged in virtually the same conduct. The alleged retaliation was initiated under suspicious circumstances and, on the eve of an election wherein the speaker was seeking re-election, the fact that an investigation was underway was leaked to newspapers (and allegedly to the speaker's opponent in that election).

The second alleged act of retaliation is the refusal to reimburse legal expenses incurred in exonerating the party under investigation where the defendants premised that refusal on a patently fatuous reason (the lack of authority to reimburse). The institution of the investigation clearly necessitated the assistance of counsel because, as Rich told McWaters, the charges portended both civil and criminal consequences. That assistance of counsel cost over $21,000.00 which, under state law, the defendants were authorized to reimburse. The defendants' decision that they did not possess this statutory authority meant that McWaters had to pay for all of her legal expenses. Thus, the adverse affect arose not only by being subjected to a highly questionable investigation, but also by be-

ing forced to incur legal expense to defend against potential civil and criminal liability (which at least one of the defendants contemplated).

The defendants rely on several decisions to support their assertion that the conduct upon which McWaters bases her complaint is, as a matter of law, not actionable on account of its lack of adverse effect. First, they rely upon the Fourth Circuit's decision in *Suarez Corp.*, wherein the plaintiff, a direct mail marketing company that had been accused of, and investigated in connection with, violations of consumer protection laws, sued state officials for retaliation on the basis of allegedly defamatory (and some admittedly truthful) statements that those officials had made to the media and to other parties involved in the investigation. The Fourth Circuit found that none of the defendants' statements "concerned private information about an individual[,]" therefore, it held that the relevant legal inquiry was "whether [the] speech was threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow." The Court held that the plaintiff had failed to make the requisite showing and, accordingly, it vacated the lower court's denial of qualified immunity. *See Suarez Corp.*, 202 F.3d at 685–91.

*Suarez* is factually distinguishable because, there, the allegedly retaliatory conduct was the form of public statements directed toward the plaintiff, not the exercise of official investigatory power (which included the threat of possible criminal consequences). To avoid these possible criminal consequences, it was necessary for McWaters to secure the advice of counsel. Moreover, McWaters complains not only about the decision to institute an investigation but also about the decision to deny her request for reimbursement of legal fees after the investigation failed to

uncover any criminal activity. Thus, McWaters has alleged adverse effect within the meaning of *Suarez Corp.*

The defendants also rely upon the Fifth Circuit's decisions in *Benningfield v. City of Houston,* 157 F.3d 369 (5th Cir.1998) and *Colson v. Grohman,* as well as the Sixth Circuit's decision in *Mattox v. City of Forest Park.* In *Benningfield,* the Fifth Circuit held that the following actions taken against the plaintiffs, who were employees of the City of Houston Police Department, by their supervisors, did not constitute legally cognizable "adverse employment actions": (1) false accusations of misconduct; (2) changing the plaintiff's working hours; and (3) criticism in the form of verbal reprimands. 157 F.3d at 376–78. The actions underlying the alleged adversity in *Benningfield,* therefore, are not at all analogous to those at issue in this case. Here, at least one aspect of the adverse effect takes the form of tangible economic damages.

Nor does *Colson* assist the defendants. There, the Fifth Circuit addressed a claim by an elected city council member that she was subjected to criticisms, institution of a meritless investigation, and false accusations in retaliation for her own criticism of police department policies. After holding that, viewed in isolation, none of the individual practices of which the plaintiff complained were severe enough to be actionable under First Amendment jurisprudence, the court examined "the campaign of retaliatory harassment as a whole" and arrived at the same conclusion. The court explained that "[e]ven viewing the summary judgment evidence in the light most favorable to [the plaintiff], the defendants' allegedly retaliatory crusade amounted to no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure." 174 F.3d at 514.

Again, McWaters proffers a very different sort of adverse effect. Even if the institution of the investigation in this case properly could be analogized to the retaliatory campaign in *Colson*, the plaintiff in *Colson* simply did not allege the type of monetary injury of which McWaters complains.

Finally, in *Mattox*, the Sixth Circuit entertained a claim by a former city council member who alleged that public officials had created adverse publicity about her in a report that was issued in response to a criminal investigation that she had instituted against the local fire department. After recognizing that, in some cases, " 'injury based on embarrassment, humiliation, and emotional distress' is sufficient to be actionable under [section] 1983[,]" the court held that the plaintiff had failed to plead that she had suffered substantial enough injury. 183 F.3d at 522. The court explained as follows:

> Mattox, a political figure, staked out a controversial position on a political issue in her town, and it cost her political capital and, ultimately, a re-election bid.... As an elected public official, Mattox voluntarily placed herself open to criticism on her actions and views on political matters. A deliberate attempt to discredit Mattox, especially if initiated in retaliation for her actions in investigating the fire department, is perhaps an inappropriate and unfortunate occurrence, but on the facts of this case, it is not the type of 'adverse action' against which the First Amendment protects. It is not equivalent to being fired by a government employer for expressing protected views. We do not think it would deter a public official of ordinary firmness from expressing his or her

right to speak under the First Amendment. Public officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views. *Id.*

Unlike this case, the plaintiff in *Mattox* encouraged an investigation into the fire department and was criticized in the very report that was issued in response to the investigation. That is a far cry from the allegations in McWaters' complaint.[24] Nor did the investigation in *Mattox* arise from a highly dubious provenance, as did the one that McWaters faced. Moreover, to the extent that the defendants read *Mattox* as supporting the view that the Constitution permits retaliation against elected public officials who have exercised their First Amendment rights in the discharge of their public duties merely because they are elected, *Mattox* would be in direct conflict with the Supreme Court's decision in *Bond* and, thus, of no efficacy (at least on the facts alleged in the Complaint here). *See supra*, at 808, n. 28.

McWaters points to the Fourth Circuit's decision in *Trulock* in support of her position. In *Trulock*, the plaintiff, who had written a magazine article in which he criticized the government for ignoring a security breach at a nuclear facility, alleged that federal agents had retaliated against him by conducting a search and seizure of his property (just a few weeks after the article was published). The Fourth Circuit reversed the district court's dismissal (pursuant to Rule 12(b)(6)) of the First Amendment retaliation claim because it found that the plaintiff had "alleged sufficient facts ... to withstand a motion to dismiss and proceed to discovery." 275

---

**24.** Although it is true that McWaters spoke out with respect to (and subsequently was investigated in connection with) issues that were fiscal in nature, she was challenging merely whether certain expenditures were ap-

propriate as a policy matter, not whether they were proper or permissible as a legal matter. In addition, the expenditures McWaters challenged did not involve travel; they involved the public schools.

F.3d at 405–06 (finding it "well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right[,]" and that "[t]his holds true even when the act of the public official, absent the retaliatory motive, would otherwise have been proper.").

What better way is there to retaliate against an elected official than to take actions likely to affect a close election, to characterize the conduct of the official as potentially criminal in nature, and to time everything in a way such that the official cannot effectively confront or rebut the accusations made against her? Further, how could such conduct not be expected to chill speech when, after forcing the official to defend against such accusations and potential criminal liability, the actors then refuse even to reimburse expenses caused thereby? That kind of adverse impact, if condoned by the courts, reasonably would be expected to chill the free exercise by a public official of her First Amendment rights.

However, even if it can be said that, to some extent, McWaters invited public criticism (from which the Constitution does not shield public officials), the Constitution does protect officials such as her from having their First Amendment freedoms chilled by way of the discriminatory application of state law. This is precisely what McWaters alleges—that the free speech rights of elected officials are chilled by baseless retaliatory investigations intended to unseat them in an election and by the very tangible economic impact of the defendants' decision to apply Va.Code § 15.2–1521 in a manner different than the way in which ordinarily it would be applied (i.e., by failing even to consider her request for legal fee reimbursement). On this ground, and on a motion to dismiss for failure to state a claim, McWaters has satisfied the adversity requirement.

### (4) The Causation Requirement

There appears to be some disagreement, even within the Fourth Circuit, as to the appropriate burden of proof that a plaintiff alleging retaliation bears with respect to the issue of causation. Some decisions have required that the plaintiff meet a very high burden on this issue—that is, a plaintiff must prove that "but for the protected expression the employer would not have taken the alleged retaliatory action." See e.g., Holland v. Rimmer, 25 F.3d 1251, 1254 (4th Cir.1994); Huang v. Board of Governors of the University of North Carolina, 902 F.2d 1134, 1140 (4th Cir.1990) (explaining that "[t]he causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; claimant must show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action."); Goad v. Silverman, 121 F.3d 698, 1997 WL 543380, at *5 n. 7 (4th Cir.1997) (unpublished) (interpreting Supreme Court's decision in Mt. Healthy); Saleh, 2001 WL 585085, 11 Fed.Appx. 241, 255–56. Other decisions, however, have indicated that the retaliation must have been motivated only "in substantial part" or "at least in part" by the plaintiff's protected conduct. See e.g., Goldstein, 218 F.3d at 352 (explaining that speech must have been a "a 'substantial factor' in the decision to take the allegedly retaliatory action."); McVey, 157 F.3d at 277–78 (same); Cutts v. Peed, 2001 WL 963728, 17 Fed. Appx. 132, 134 (4th Cir.2001); Mattox, 183 F.3d at 520 (retaliatory action must have been motivated "at least in part as a response to the exercise of the plaintiff's constitutional rights.").

The decision in Flickinger v. School Board of the City of Norfolk, Virginia, 799 F.Supp. 586 (E.D.Va.1992), in which Judge Smith examines these differing burdens of

proof, is instructive on this issue. Turning for guidance to the Supreme Court's decision in *Mt. Healthy,* Judge Smith explained that the burden of proof in retaliation cases is a shifting one. Thus, at the initial stage, the burden of proof is on the plaintiff to prove that the exercise of a constitutionally protected right was a substantial or motivating factor in the retaliatory action taken against him. Once the plaintiff satisfies this hurdle, however, the burden shifts to the defendant to prove that he would have acted in the same manner with respect to the plaintiff even absent the protected activity. *Flickinger,* 799 F.Supp. at 591, n. 13 (asserting that "[t]he court in *Huang* apparently misstates the burden of proof in retaliatory action cases.") (*citing Givhan,* 439 U.S. at 416, 99 S.Ct. at 697 and *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576).

The *Flickinger* opinion is well-reasoned and it is drawn directly from the instruction of the Supreme Court. In the *Mt. Healthy* decision, the Court explained as follows:

> Initially, in this case, the burden was properly placed upon [plaintiff] to show that his conduct was constitutionally protected, and that his conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the [defendant's] decision not to rehire him. [Plaintiff] having carried that burden, however, the District Court should have gone on to determine whether the [defendant] had shown by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct.

429 U.S. at 287, 97 S.Ct. 568. *See also Board of County Commissioners, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 685, 116 S.Ct. 2342, 2352, 135 L.Ed.2d 843 (*citing Mt. Healthy* ). That, then, is the methodology by which to examine the causation element of McWater's retaliation claim. At this stage (on a motion to dismiss), McWaters must have affirmatively pleaded that her exercise of protected activity was a substantially motivating factor in bringing about the alleged retaliatory decisions. McWaters has satisfied her duty by way of the very specific allegations in her Complaint.

To begin, the County Attorney and the other members of the Board (except Bise who had not been elected yet) had approved McWaters' expenses in 1998. The County Attorney and the Board are legally obligated to review expense claims before they are paid out of the County's coffers. Presumably, both fulfilled their duties. Thus, notwithstanding the criticism at the Board meeting on October 11, 1999, McWaters' expenses enjoyed an extant stamp of approval. Moreover, after the criticism at that meeting, Owen (at McWaters' request) reviewed her expenses and (on October 25) expressed the view that they were appropriate, thereby reinforcing that further explanation or inquiry was not necessary.

With six days left before the election, and with McWaters in a hotly contested race, Owen informed his staff that (for no apparent reason) he recently had begun to entertain reservations about McWaters' expenditures, and he went to the County Attorney (Rick) and asked him to investigate the matter. On the next day (a Friday) Rick commenced an investigation into the expense claims that already had been approved by the Board and verified by Owen. This activity purportedly had to do with whether McWaters had been reimbursed for expenses for a day or so longer than the duration of the conference. However, even though Manning had traveled with McWaters and stayed in Portland for the same amount of time (facts to which McWaters' husband had directed Rick's

attention on October 28), no investigation was commenced or pursued as to Manning.

Rick notified Cosby, the Board chairman, that an investigation had been commenced and, within two days thereafter (and with 2 days left before the election), an article about the investigation was published in the newspaper. In addition, McWaters' opponent in the election (Bise), prepared a piece of negative campaign literature attacking McWaters' Portland expenses.

Thereafter, the Board refused to put an end to the matter or even to hear McWaters' side of the story. Instead, it acted to ensure that the investigation would continue. When, after she was cleared of any wrongdoing, McWaters sought reimbursement for the relatively modest legal fees that she had incurred in connection with the investigation, the Board refused to reimburse her. The reason that the Board gave was that, upon Rick's advice, the Board had decided that it had no authority to effect the reimbursement. That conclusion, of course, is at odds with the very same statute under which the Board previously had found the authority to pay legal fees incurred by other Board members.

The Complaint alleges that story with specificity. The timing and the circumstances attending the commencement of the investigation, as well as the substantively dubious nature of investigating previously approved and verified expenses only as to the outspoken McWaters, permits the inference that retaliation motivated the defendants' actions. The refusal to pay McWaters' legal fees on the ground that there was no authority to do so also permits an inference of retaliation given that the law clearly is to the contrary and previously has been applied to reimburse others.

Accordingly, McWaters properly has alleged that her First Amendment rights were violated.

## C. Whether the Rights Were Clearly Established

Having concluded that McWaters has alleged constitutional violations, it is now necessary to evaluate whether those rights were "clearly established" at the time of the conduct of which she complains.

For a right to have been "clearly established", "the contours of the right must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Edwards v. City of Goldsboro,* 178 F.3d at 251 (*citing Swanson v. Powers,* 937 F.2d 965, 969 (4th Cir.1991)). The proper focus in such an inquiry should be on the right at the level of its application most specific to the conduct being challenged, not to the right in the abstract. *See e.g., McCrerey,* 925 F.Supp. at 1140 (*citing Wiley v. Doory,* 14 F.3d 993, 995 (4th Cir.1994)).

In determining whether a right was clearly established at the time of the claimed violation, "courts in [the Fourth] Circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this Court of Appeals, and the highest court of the state in which the case arose ...." *Edwards,* 178 F.3d at 251; (*citing Jean v. Collins,* 155 F.3d 701, 709 (4th Cir.1998) (*en banc* )). However, it is not necessary that a case have been decided respecting conduct identical to that of the defendant in the case at bar in order for a right to have been clearly established. *McCrerey,* 925 F.Supp. at 1140 (*citing Pritchett v. Alford,* 973 F.2d at 314); *see also Buonocore v. Harris,* 65 F.3d 347, 356–57 (4th Cir.1995); *Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.1995); *Cromer v. Brown,* 88 F.3d 1315, 1324–25 (4th Cir. 1996). Still, officials should not be held liable "for bad guesses in gray areas; they are liable for transgressing bright lines." *McVey,* 157 F.3d at 277 (*citing Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir.

1992)). Therefore, "where the relevant inquiry requires 'particularized balancing' which is 'subtle, difficult to apply, and not yet well defined' it will be 'only infrequently' that the right at issue is 'clearly established.'" *McCrerey*, 925 F.Supp. at 1140 (*citing DiMeglio*, 45 F.3d at 806).

 McWaters alleges the right to be free from arbitrary, irrational, and discriminatory application of (1) a statutory power to investigate; and (2) a law prescribing discretionary authority for approving the expenditure by public employees of public funds. She also alleges the right of an elected official to be free from other officials' exercising statutorily-prescribed discretion (respecting the commencement of an investigation and the denial of a claim for reimbursement of legal fees) in retaliation against the exercise of rights guaranteed by the First Amendment.

### 1. The Equal Protection Claim

With respect to the first right, although *Olech* (which was decided February 23, 2000) was not decided until after the Board arrived at the decision to investigate McWaters (October 28, 1999), it already had been decided by the time the decision not to reimburse her legal fees was made (August 14, 2001). Accordingly, it is not necessary to delve into the history of the right of an individual to be free from the arbitrary and discriminatory application of law[25] because, by the time Owen informed McWaters that the Board had no authority to reimburse her legal fees, *Olech* had been decided.

*Olech* confirmed that government officials constitutionally may not apply a law arbitrarily to, or with the intent to discriminate against, a person who is similarly situated to others to whom that law also

has been applied. Moreover, in deciding *Olech*, the Supreme Court clearly articulated that its holding was not based on a novel legal theory. To the contrary, it explained *per curiam* (and cited cases to support) that, since 1923, "[o]ur cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564, 120 S.Ct. at 1074. The citations make clear that the Court was confirming and clarifying, rather than revealing for the first time, that such a "class of one" claim is constitutionally cognizable and available to redress conduct violative of equal protection (and that such a claim existed years before the investigation was commenced against McWaters and her request for reimbursement was denied).

Of course, it was equally clear that governing bodies and their agents have an obligation to ensure that public funds are spent in a responsible manner. Indeed, this is the thrust of Va.Code § 15.2–1245, which vests substantial discretion in the County as to the investigation and approval of claims for reimbursement of expenses by public officials. If, in the *good-faith* exercise of their discretion, the defendants decided that McWaters' expenditures were improper and, thus, not deserving of public reimbursement, no clearly established right would be violated. But that is not what McWaters has alleged. She has alleged that the defendants exercised their discretion respecting both the investigation into her expenditures and the reimbursement of her legal fees in an arbitrary and discriminatory manner.

---

**25.** *See generally* J. Michael McGuinnes, *The Rising Tide of Equal Protection: Willowbrook and the New Non–Arbitrariness Standard,* 11 Geo. Mason U. Civ. Rts. L.J. 263 (2001).

## 2. The Retaliation Claim

Whether the right at issue with respect to McWaters' First Amendment claim was clearly established by the time the defendants acted is an only slightly closer question. McWaters has alleged that the defendants violated her right to be free from official action taken in retaliation for the exercise of First Amendment rights. Many cases decided before the conduct at issue in this case reflect the basic principle that "[r]etaliation by a public official for the exercise of a constitutional right is actionable under 42 U.S.C. § 1983, even if the act, when taken for different reasons, would have been proper." *See e.g., ACLU v. Wicomico Cty.*, 999 F.2d at 785 (*citing Mt. Healthy City School District Bd. Of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Huang*, 902 F.2d at 1140.

The Fourth Circuit's decision in *Lewis* (decided in 1984) is particularly instructive. In that case, as noted above, the court considered a retaliation claim brought by a state magistrate judge. The plaintiff alleged that the decisions not to renominate and reappoint her were made in retaliation against her vocal opposition to certain administrative tasks that she had been ordered to undertake. The court stated the applicable rule as follows:

> Even if we assume that [the plaintiff] had no property interest in her position, it is true that [the defendants] could have refused to renominate and reappoint her for a foolish reason or for no reason at all. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is equally clear, however, that *they could not lawfully have re-*fused to renominate and reappoint her for an unconstitutional reason, such as in retaliation for the exercise of rights protected under the First Amendment . . . .

*Lewis*, 734 F.2d at 1004 (emphasis supplied). After agreeing with the district court that the plaintiff's speech and conduct were protected by the First Amendment, and that the issue that she was protesting was a matter of legitimate public concern, the court affirmed the finding that the defendants' decisions were retaliatory. *Id.* at 1004–08. The panel decision, that the plaintiff had established causation, subsequently was reversed after a rehearing *en banc. See* 759 F.2d 1171, 1172 (4th Cir.1985). However, the full Court of Appeals did not upset the panel's exposition of the applicable rule of law, therefore, at least since *Lewis*, Fourth Circuit law has been clear on that point.

*Lewis* is useful, here, because had the plaintiff in that case successfully proved causation, her claim ultimately would have succeeded. Notwithstanding her deficiency on that ultimate issue, the passage cited above unambiguously reflects that, even with respect to decisions for which substantial discretion is vested in public officials, such discretion may not be exercised in a retaliatory manner.[26] Applied here, that rule would mean that, although the defendants could have chosen not to consider McWaters' request for reimbursement of legal fees for a "foolish" reason, "or for no reason at all," they were not permitted to do so for an unconstitutional, retaliatory reason.[27] Just as in *Lewis*, the burden of establishing that retaliation in fact was the motivation behind the alleged

26. *See also supra,* at 793.

27. After *Olech*, and in recognition of the equal protection principles underlying that decision, the statement in *Lewis* that officials may take adverse action against an individual "for no reason at all" may paint with too broad a brush. That said, however, the principle that an official may not take such action in retaliation for the exercise of First Amendment rights has long been beyond serious dispute.

unconstitutional actions falls on McWaters. But that is not her burden in defending against a motion under Rule 12(b)(6).

With this principle in mind, the defendants' reliance on cases such as *Colson* and *Mattox* is misplaced. While those cases (neither of which arose out of the Fourth Circuit) do suggest that elected officials may be required to withstand more by way of criticism and rebuke than ordinary citizens, they do not stand for the proposition that elected officials possess less rights under the First Amendment than do ordinary citizens, or that they cannot as a matter of law state a claim for retaliation thereunder.[28] Moreover, those cases turn on precepts respecting "adverse impact" (or severity of harm) that are not present here because McWaters has suffered a very real injury—that is, her legal fees.[29]

### D. Would A Reasonable Public Official In The Same Position Have Known That His Actions Violated These Rights

This final inquiry does not require much discussion because, "[w]hen the inquiry proceeds to this point, the 'immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct[.]' " *Di-Meglio*, 45 F.3d at 795, n. 1 (*citing Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738). Still, in some cases the defendant may be able to show " 'extraordinary circumstances' and 'prove that he neither knew nor should have known of the relevant legal standard.' " *DiMeglio*, 45 F.3d at 795, n. 1 (*citing Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738).

In this case, the defendants have not even argued this facet of the test. This is not surprising given that there is no discernible reason why public officials in the positions held by these defendants should have been unaware of either the constitutional rights described above or that their alleged conduct would have violated those rights. There are no extraordinary circumstances in this case that indicate that the defendants neither knew nor reasonably should not have been expected to know the relevant legal standards.[30] To the contrary, as elected public servants charged with overseeing the administration of the County's public resources and policy, it is incumbent upon them to be cognizant of, and to comply with, constitutional norms. The rights that McWaters accuses the defendants of having violated do not exist on the outer edges of constitutional jurisprudence. They are cornerstones of our democracy.

### CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss this action based on the affirmative defense of qualified immunity is denied. In addition, the discussion of qualified immunity makes clear that McWaters properly has stated cognizable claims under both the Equal Protection clause of the Fourteenth Amendment and

---

**28.** Indeed, those decisions cannot properly be construed to stand for such a proposition in perspective of *Bond v. Floyd*, in which the Supreme Court held that "the disqualification of [the plaintiff] from the Georgia House [of Representatives] because of his statements violated [his] right of free expression under the First Amendment." 385 U.S. at 136–37, 87 S.Ct. at 349–50.

**29.** *See supra.*

**30.** It should be noted that, in considering the issue of qualified immunity, an official-defendant's reliance upon advice of counsel may be pertinent (although it is not dispositive). *See e.g., Swanson v. Powers*, 937 F.2d 965, 972 (4th Cir.1991); *V–1 Oil Co. v. Wyoming Dept. of Environmental Quality*, 902 F.2d 1482 (10th Cir.1990). None of the defendants have raised this argument in support of their qualified immunity defense, and there are no facts alleged upon which to consider the issue, therefore, it is not relevant at this juncture.

under the First Amendment, *see supra*, at 790–805, and, therefore, the defendants' Motion to Dismiss for failure to state a claim upon which relief can be granted also is denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.